COMMONWEALTH vs. RICHARD DEVLIN.

Norfolk.    May 8, 1974. — August 5, 1974.

Present: TAURO, C.J., REARDON, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Accessory.*

Even though there was evidence that a defendant charged with being an accessory after the fact under G. L. c. 274, § 4, removed fingerprints from a knife used in a stabbing, motions by him for a directed verdict should have been allowed in the absence of evidence that he knew a felony had been committed with the knife or knew the identity of the felon. [135-136]

INDICTMENT found and returned in the Superior Court on January 8, 1973.

The case was tried before *Spring, J.*

*Joseph F. Flynn* for the defendant.

*Robert B. Russell,* Assistant District Attorney, for the Commonwealth.

HENNESSEY, J.    The defendant was convicted on an indictment[1] charging him with being an accessory after the

---

[1] The indictment read as follows:

"COMMONWEALTH OF MASSACHUSETTS

Norfolk, ss. At the Superior Court, begun and holden at Dedham, within and for the County of Norfolk, on the first Tuesday of January in the year of our Lord one thousand nine hundred and seventy-three.

The Jurors for the Commonwealth of Massachusetts, on their oath present that Peter L. Bartoloni of Walpole in the County of Norfolk, on or about the eighteenth day of October in the year of our Lord one thousand nine hundred and seventy-two at Walpole in the County of Norfolk, being armed with a dangerous weapon, to wit, a knife, did assault Richard E. Hayes with intent to murder him,

That Richard Devlin, of Walpole, County of Norfolk, at Walpole, County of Norfolk, afterwards, well knowing the said Peter L. Bartoloni, to have committed the felony aforesaid, did harbor, conceal, maintain or assist said Peter L. Bartoloni, with intent that said Peter L. Bartoloni, should avoid or escape detention, arrest, trial or punishment."

fact to an assault with intent to murder. G. L. c. 274, § 4.[2]
He was sentenced to serve one year and one day at
Massachusetts Correctional Institution at Walpole from
and after the expiration of the sentence he was then serving.
By his bill of exceptions he assigns as error the denial of his
motions for a directed verdict,[3] the admission of certain
evidence and a portion of the judge's supplementary charge
to the jury.

As we conclude that the motions for a directed verdict
were improperly denied and the conviction must therefore
be reversed, we need not consider the other assignments of
error.

We state the facts relevant to the motions for a directed
verdict. Correctional Officer Paul Boris testified for the
Commonwealth that on October 18, 1972, he was on duty in
block B-2 of Massachusetts Correctional Institution at
Walpole between the hours of 3 P.M. and 11 P.M. While
seated at the officer's desk in that block, he heard a scuffle
on the third tier, looked up at the tier, and saw inmate
Richard E. Hayes being pursued by inmate Peter L.
Bartoloni. Thereupon, Boris promptly left the block and
slammed the block door behind him, which served as an
alarm to the other officers in the prison. Several other
correctional officers rushed to block B-2, entered the block
with Boris, and raced up the stairs to the third tier. Boris

---

[2] General Laws c. 274, § 4, as appearing in St. 1943, c. 488, § 1, reads as follows:
"Whoever, after the commission of a felony, harbors, conceals, maintains or
assists the principal felon or accessory before the fact, or gives such offender any
other aid, knowing that he has committed a felony or has been accessory thereto
before the fact, with intent that he shall avoid or escape detention, arrest, trial or
punishment, shall be an accessory after the fact, and, except as otherwise
provided, be punished by imprisonment in the state prison for not more than
seven years or in jail for not more than two and one half years or by a fine of not
more than one thousand dollars. The fact that the defendant is the husband or
wife, or by consanguinity, affinity or adoption, the parent or grandparent, child or
grandchild, brother or sister of the offender, shall be a defence to a prosecution
under this section. If such a defendant testifies solely as to the existence of such
relationship, he shall not be subject to cross examination on any other subject
matter, nor shall his criminal record, if any, except for perjury or subornation of
perjury, be admissible to impeach his credibility."

[3] Two such motions were submitted, one apparently at the close of the
Commonwealth's case and the other at the close of all the evidence.

testified that on this tier he observed Bartoloni crouched over Hayes who was bleeding from apparent stab wounds. Soon after Boris arrived, he heard the clank of metal on the bottom tier or the so called "flats" area of the block. After he assisted Hayes down the stairs, Boris went to his desk to telephone the institution infirmary. Immediately after that, he proceeded toward cell No. 3 where he saw several inmates and guards gathered. Before he arrived at the cell, he saw the defendant handing a towel to Senior Correctional Officer Gratton.

Correctional Officer Roger Bolduc testified that he was also on duty in block B-2 and accompanied Boris when he left the block. Later Bolduc went up to the third tier with Boris and after the injured inmate was escorted downstairs, Bolduc remained at the top of the stairs where he found a knife sheath.

Senior Correctional Officer William Gratton testified that he was on duty in the corridor outside block B-2 on the night in question. When the alarm sounded, he proceeded to block B-2 and entered therein with the other officers. Shortly after he entered, a knife fell to the "flats" area, and he attempted to retrieve it. The knife was kicked into cell No. 3 and, as Gratton started toward that cell, inmate Robert Corcione blocked his entrance. Gratton then saw the defendant go inside the cell, pick up a white T-shirt, bend over, and motion with his elbows in a back-and-forth manner. Following this, the defendant turned around and gave a knife wrapped in the T-shirt to Gratton.

Correctional Officer Russell Evans testified that he was also on duty during the night in question and responded to the alarm. He ran upstairs with the other officers and saw Bartoloni throw a knife off the third tier.

There was further testimony to the effect that there were between twenty and thirty inmates in the "flats" area of the cell block both when Bolduc and Boris left the block and when the officers reëntered the block.

A fingerprint expert from the State police laboratory testified that tests performed on the knife and the knife sheath revealed no latent prints.

There was evidence that various blood tests were performed on the knife, the sheath, and the clothing gathered from Hayes and Bartoloni. The tests revealed the presence of human blood on the knife and on several of the articles of clothing.

The defendant took the stand in his own defence and testified that on October 18, 1972, he had been outside the block when the incident began. As he was entering the block, a number of correctional officers passed by him and slammed the block door. Once inside the block, the defendant questioned several inmates about what had happened. In the midst of this discussion, somebody in the vicinity of cell No. 3 called for the block representative. As the defendant was the block representative at the time, he hurried to cell No. 3, where he was told that a knife had been kicked into the cell. He went inside the cell, found the knife, and with a T-shirt picked up the knife. He then handed the knife and T-shirt to Officer Gratton.

1. We assume, although we need not so decide, that the evidence was sufficient to show that the actions of the defendant constituted aid to the principal felon, presumably by removing his fingerprints from the knife. However, we do not believe there was sufficient evidence that the defendant either knew that a felony had been committed, or that he knew the identity of the principal felon, to warrant submission of the case to the jury. The record does not indicate that the blood later shown by chemical tests to have been present on the knife was visible to the defendant. Even assuming that it was, the Commonwealth presented no testimony that would indicate the defendant knew how the knife had been used. While mere possession of the knife was no doubt a violation of prison regulations, and even assuming it was a crime, it was certainly not a felony to which the defendant could have been an accessory after the fact. The defendant's own testimony was that he was not present when the disturbance began and was inquiring of other inmates as to what had occurred when he was called to the scene of his alleged crime. It would be mere speculation to conclude that he had learned of the felony or

such details as who had committed it. Cf. *Commonwealth v. Albert,* 310 Mass. 811, 816-817 (1942); *Commonwealth v. Shea,* 324 Mass. 710, 714 (1949); *Commonwealth* v. *Croft,* 345 Mass. 143, 145 (1962).

We hold that knowledge of the particular felony which has occurred is an element of the crime of being an accessory after the fact which must be proved beyond a reasonable doubt. That is to say, one charged as such an accessory must be shown to have been aware, by his observations or by information transmitted to him, of the substantial facts of the felonious crime.[4] Since there was a failure to prove that knowledge in this case, a directed verdict for the defendant is required.

2. The accessory after the fact must also be shown to have had knowledge of the identity of the principal felon. There was not the slightest showing here that the defendant was aware that the principal, Bartoloni, was concerned in the matter. For that reason, too, the defendant must have a directed verdict.

Since there is total absence of knowledge here, we need not reach discussion of the minimum evidence which might be required to establish sufficient knowledge of identity. Nor need we discuss the nature of such proof.[5]

The common law emphasized, as a basis for liability, the personal relationship between principal and accessory. In fact, the accessory was often considered "an accomplice in the original crime." Am. Law Inst., Model Penal Code, comments to § 208.32 at 195 (Tent. draft No. 9, 1959). The accessory was defined by his direct, personal assistance as one who receives and comforts, or conceals the principal felon. See *United States* v. *Shapiro,* 113 F. 2d 891, 893 (2d Cir. 1940). This assistance could be provided in a variety of ways: "[G]enerally, any assistance whatever given to a

---

[4] There is no suggestion here that the knowledge of the accessory must be such that he is able to put a name or label on the felony — only that he is aware of the substantial facts which make up the elements of the felony.

[5] For example, suppose a defendant witnessed the flight of a robber, who was a stranger to him, whereupon the defendant wilfully impeded pursuit of the robber by a police officer. Is this sufficient knowledge by the defendant as to the identity of the felon?

felon, to hinder his being apprehended, tried, or suffering punishment, makes the assistor an accessory. As furnishing him with a horse to escape his pursuers, money or victuals to support him, a house or other shelter to conceal him, or open force and violence to rescue or protect him." 4 Blackstone, Commentaries, 37-38 (1769).

The requirement that relief or assistance be given to the felon personally is also illustrated by the common law doctrine that one could never be convicted as an accessory after the fact for receiving stolen goods "because he only received the stolen goods and did nothing to receive the felon." *Virgin Islands* v. *Aquino,* 378 F. 2d 540, 553, fn. 21 (3d Cir. 1967), citing 4 Blackstone, *supra,* at 37-38. This crime is, of course, now separately provided for by statute. G. L. c. 266, § 60, 62.

A proper interpretation of G. L. c. 274, § 4, also demands incorporation of this knowledge requirement. The language of the statute is in the common law form. The words themselves require aid to the principal felon "knowing that he has committed a felony." The plain meaning of these words requires knowledge of the identity of the principal. This requirement of knowledge is clearly not a superfluous part of the statute[6] but is an essential element of the offence, and proof of that knowledge is a prerequisite to conviction. *Commonwealth* v. *Spezzaro,* 250 Mass. 454, 458 (1925). *Commonwealth* v. *Wood,* 302 Mass. 265, 271, 272-273 (1939). *Commonwealth* v. *Tilley,* 327 Mass. 540, 545-546 (1951).

Even should the statutory language be deemed ambiguous, it would be appropriate so to construe it. This is so not only because of the historical context of the statute, an earlier version of which was passed in 1784[7] and obviously has roots in the common law tradition, but because ordinary rules of statutory construction require us to construe any criminal statute strictly against the Com-

---

[6] Were this so, the variance between proof and the form of the indictment would not have been fatal to the Commonwealth's case, as we would then have regarded the words of requirement as mere surplusage.

[7] St. 1784, c. 65, § 2.

monwealth. *Commonwealth* v. *Paccia,* 338 Mass. 4, 6 (1958). Cf. *Commonwealth* v. *Hughes,* 364 Mass. 426, 433-434 (1973), dissenting opinion. We have previously construed c. 274, § 4, in precisely this manner. Before it was amended by St. 1943, c. 488, § 1, to specify that consanguinity was an affirmative defence, we reversed a conviction for failure to allege and prove that a defendant was without the protected degrees of relationship. *Commonwealth* v. *Sokorelis,* 254 Mass. 454 (1926). Cf. *Commonwealth* v. *Wood,* 302 Mass. 265 (1939).

The Commonwealth is mistaken in alleging that we have affirmed convictions in the absence of such knowledge. In *Commonwealth* v. *Eagan,* 357 Mass. 585 (1970), the defendant, whose conviction of accessory after the fact to kidnapping was affirmed, was apparently present at the scene of the beating and abduction and drove the principal felons from the scene of the victim's abandonment. In *Commonwealth* v. *Valleca,* 358 Mass. 242, 243-244 (1970), while the principal felons were identified in the indictment only as John Doe and Richard Roe, there was evidence at the trial that the defendant told a witness "that he knew the circumstances of the taking of the silver, as well as the 'two youths' who had broken into and entered the gallery. The defendant further stated that the youths had approached him in order to facilitate the disposal of the silver." In *Commonwealth* v. *Tilley,* 327 Mass. 540, 545 (1951), we specifically pointed out that "the judge was warranted in finding that the defendant knew that McAleney was the person responsible for Spiegel's loss of the instruments."

3. In summary, it is clear that there was insufficient proof of the requisite elements of the statutory crime charged in the indictment. It may be considered that the defendant's acts constituted what is in some jurisdictions called "obstruction of justice." He was not so charged and therefore we need not consider whether such a common law crime exists in Massachusetts. Cf. *Commonwealth* v. *Kirby,* 2 Cush. 577 (1849); *Commonwealth* v. *Reynolds,* 14 Gray 87 (1859). See also Am. Law Inst., Model Penal Code,

Proposed Official Draft (1962) §§ 242.1, 242.3, and Proposed Criminal Code of Massachusetts, c. 268, §§ 9, 11 (1972), for suggested statutory language for crimes of this type. See, generally, Perkins, Criminal Law (2d ed.) 494-500 (1969); Williams, Criminal Law, The General Part (2d ed.) §§ 139-141 (1961).

The defendant's exceptions are sustained and judgment is to be entered for the defendant.

*So ordered.*