COMMONWEALTH *vs.* FRANCIS D. HALEY, JR.

Middlesex. June 9, 1986. — October 15, 1986.

Present: GREANEY, C.J., KAPLAN, & ARMSTRONG, JJ.

*Motor Vehicle,* Operating under the influence, Homicide. *Practice, Criminal,* Instructions to jury, Sentence. *Proximate Cause. Statute,* Construction. *Due Process of Law,* Vagueness of statute.

At the trial of indictments charging vehicular homicide, operating a motor vehicle under the influence of intoxicating liquor, and related crimes, the judge's instructions on operating under the influence did not present a substantial risk of a miscarriage of justice, where the judge's use of the expression "to some extent affected by it [consumption of alcohol], having his faculties affected by it," indicated that the issue put to the jury was whether the defendant's consumption of alcohol diminished his capacity to operate a motor vehicle safely; and where, in light of the overwhelming evidence of the defendant's intoxication and the jury's finding that he had been driving negligently, it was extremely unlikely that the jury could have concluded that the defendant's negligent operation of the vehicle was not related to alcohol consumption. [13-14]

At the trial of indictments charging vehicular homicide and related offenses, there was no substantial risk of a miscarriage of justice in the judge's failure to instruct the jury on the possibility that the victim had contributed by his negligence to his own death, where the evidence in the case virtually excluded the hypothesis that the victim was solely at fault, and where the instructions given required that the defendant be shown to have caused the death. [14-15]

On appeal from a conviction of causing a death while operating an automobile under the influence of intoxicating liquor, it was held that a prisoner sentenced under the provisions of G. L. c. 90, § 24G (*a*), was eligible for parole or other amelioration of sentence after serving the one-year mandatory imprisonment, and that, consequently, the sentencing provisions of § 24G (*a*) were not unconstitutionally vague. [15-22]

INDICTMENTS found and returned in the Superior Court Department on May 29, 1984.

The cases were tried before *John F. Moriarty,* J.

*Frank P. Marchetti* for the defendant.

*Ellen M. Caulo,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. A jury found the defendant, Haley, guilty of vehicular homicide and related crimes, and judgments of conviction entered in October, 1984. On this appeal, the facts need not be rehearsed in detail. The jury could readily have found the following in substance.

Some minutes after 2:15 A.M. on April 15, 1984, the defendant was driving his 1974 Chevrolet Vega at a speed of 50-55 miles per hour north on route 93. The car had no inspection sticker and was missing one functioning headlight; the treads on a couple of the tires were abraded. The defendant was extremely drunk (inferred from his drunken condition when he was picked up by police less than an hour later, as mentioned below). As the defendant reached the vicinity of Assembly Square Mall, Somerville, he swerved ("jerked") some four feet into the breakdown lane from the adjacent right lane in which he had been travelling. He struck a young man evidently engaged in replacing a flat tire on a car with flashing lights parked well within the breakdown lane. By the force of the impact the man was rolled or thrown forward a distance of about 100 feet. He was pronounced dead at Massachusetts General Hospital at 3:25 A.M.[1] The defendant, although aware that he had struck someone, continued without abating his speed until he reached the next exit, where he made a right turn into Route 28 headed to Medford (Middlesex Avenue and the Fellsway).

Somerville and Medford police and State police were put on alert for the defendant's car, whose registration number had been noted by the occupants of a car that happened to be to the rear of the defendant's car at the time of the accident; one of the occupants had also seen the swerve and the body rolling down the breakdown lane. Around 3:05 A.M. Medford police saw the defendant driving his Vega erratically, at ex-

---

[1] The Commonwealth's chief medical examiner, after autopsy, gave the cause of death as "multiple traumatic injuries," "consistent with being struck by a motor vehicle." Blood alcohol of the body tested at a level of ten one-hundredths percent.

cessive speed, on Salem Street. A chase followed in which the defendant refused after command to stop, and twice or three times side-struck the police cruiser. Finally the defendant was obliged to stop, but he refused to leave the car and had to be pulled forcibly out of it. On being patted down, he was found to have defecated and urinated into his pants. He showed the signs — glassy eyes, slurred speech, unsteadiness, alcohol smell, etc. — of being very drunk. After booking at the Medford police station, and again at the Andover State police barracks, he was taken at his request to the Wilmington Regional Health Center where he was given a bandaid for a small abrasion over his left eye. Throughout he appeared drunk.

The jury in Superior Court, Middlesex County, found the defendant guilty of operating a vehicle while under the influence of intoxicating liquor (G. L. c. 90, § 24[1] [*a*] [1]); operating a motor vehicle negligently so as to endanger lives and safety (G. L. c. 90, § 24[2] [*a*]);[2] causing a death while operating a motor vehicle in both manners just described (vehicular homicide) (G. L. c. 90, § 24G [*a*]); knowingly leaving the scene of an accident after causing personal injury (G. L. c. 90, § 24[2] [*a*]); knowingly failing to stop at the signal of a police officer in uniform (G. L. c. 90, § 25).[3] The trial judge sentenced the defendant thus: for the vehicular homicide, to 9 to 10 years imprisonment at M.C.I., Walpole (the judge dismissd as duplicitous the convictions for operating under the influence and operating negligently so as to endanger); and for leaving the scene, to two years[4] at a house of correction, suspended, with probation (on condition that the defendant not drive a vehicle) for five years, to commence upon final parole

---

[2] Recklessness was not charged.

[3] The defendant was also indicted for assault and battery upon a police officer by means of a dangerous weapon, to wit, a motor vehicle, but the judge allowed the defendant's motion for a required finding of not guilty on this charge.

[4] The maximum sentence for leaving the scene under § 24(2) (*a*) is two years. At the sentencing proceeding the trial judge indicated that the sentence would be two and one-half years, suspended. The Superior Court docket reflects an apparently corrected sentence of two years.

on the sentence for the vehicular homicide. The case for refusing to stop was placed on file.

1. *"Under the influence."* The defendant raises for the first time at the stage of appeal the claim that the judge misinstructed the jury on the meaning of "operat[ing] a motor vehicle while under the influence of intoxicating liquor." The decision of *Commonwealth* v. *Connolly,* 394 Mass. 169, 173 (1985), established that under the statutory phrase (the statute involved was G. L. c. 90, § 24 [1] [*a*] [1]) "the Commonwealth must prove beyond a reasonable doubt that the defendant's consumption of alcohol diminished the defendant's *ability* to operate a motor vehicle safely. The Commonwealth need not prove that the defendant *actually drove* in an unsafe or erratic manner, but it must prove a diminished *capacity* to operate safely" (emphasis in original). To the same effect was *Commonwealth* v. *Marley,* 396 Mass. 433, 436-437 (1985).

The judge's relevant charge in the present case is set out in the margin.[5] We suggest that the expression "to some extent affected by it [consumption of alcohol], having his faculties affected by it," indicates that the issue put to the jury was whether there had been diminishment of ability or capacity to drive safely.[6] We suggest that "faculties" would be understood to equate with ability or capacity.

Suppose, however, that the charge is considered inadequate. As the defendant did not object below, the question would be

---

[5] "Now, under the influence of liquor, intoxicating liquor, does not necessarily mean drunk. But it means that the defendant must at the time have been influenced to some perceptible degree by intoxicating liquor which he had consumed.

"Drunkenness has many stages. To be guilty of the particular crime, all that is necessary is that he be influenced to some perceptible degree by the intoxicating liquor, to some extent affected by it, having his faculties affected by it. It is not necessary that he be extremely intoxicated."

[6] Contrast the erroneous instructions in *Connolly* and *Marley*. In *Connolly* the judge had charged that it was enough if as a result of drinking " 'you . . . feel slightly depressed [or] . . . slightly happier than is your norm, . . . [or] feel any abnormality.' " 394 Mass. at 171. In *Marley* the charge allowed conviction if the defendant was " 'perceptibly affected by intoxicating liquor, regardless of the effects of such liquor on his operation.' " 396 Mass. at 437.

whether there was a "substantial risk of a miscarriage of justice" arising from that fault.[7] See *Commonwealth* v. *Barrows,* 391 Mass. 781, 783-784 (1984). The answer is negative. In point is the recent case of *Commonwealth* v. *Bryer,* 398 Mass. 9 (1986). There, as here, the defendant was charged both with operating under the influence and operating negligently so as to endanger,[8] and the jury found him guilty of those charges. The court considered the instruction on operating under the influence to be defective by reference to *Connolly* and *Marley,* but there was no substantial risk of a miscarriage of justice in that conviction. In abstract theory it was possible for the jury to believe "that the negligent operation of the vehicle was not in any way related to alcohol, but was just negligent or care-less." *Id.* at 17. But the possibility that the jury reached their verdicts on this theory was very remote. There, as here, proof that the defendant was intoxicated must be taken to have been "substantial and overwhelming," and "it is highly likely that the jury chose to infer [the defendant's] state of intoxication from his conduct and appearance but not from his driving. The risk, in this case, that the jury believed that the defendant's state of intoxication had no effect on his ability to drive when they specifically found that he was driving negligently, is not substantial." *Ibid.* See also *Commonwealth* v. *Riley,* 22 Mass. App. Ct. 698, 702-703 (1986).

2. *Causation.* "[A]nd by such operation so described caused the death of another person, shall be guilty . . .": so reads the vehicular homicide statute. Accordingly, the judge charged the jury in effect that they must be satisfied beyond a reasonable doubt that the defendant's allegedly illegal operation (as described

---

[7] The interpretation of the statute made in 1985 in *Connolly* and *Marley* was not so recondite as to be beyond the cognizance of counsel trying a case in 1984; thus the defective instruction in the *Bryer* case, cited just below in the text, was given in a trial that took place in 1981, yet counsel was considered at fault in failing to object. See also *Commonwealth* v. *Gammon,* 22 Mass. App. Ct. 1, 8-9 (1986), and the remarks on "retroactivity" in *Marley,* 396 Mass. at 437.

[8] The statutes involved in *Bryer* were G. L. c. 90, § 24 (1) (*a*) and (2) (*a*). There was no injury to person.

in the statute and in other parts of the instructions) caused the death of the victim. The defendant newly contends on appeal that the judge erred in failing to instruct on the possibility that the victim contributed by his negligence to his own fatality.[9] Evidently counsel would have had the judge tell the jury to exonerate the defendant if the victim's negligence was the sole cause of the death, or preponderated over the defendant's negligent acts or omissions as the cause of the death. We are guided on this whole matter by *Commonwealth* v. *Campbell,* 394 Mass. 77, 87 (1985). True, the defendant should not be held if the victim's negligence was the sole cause of his own death. But the instruction actually given implicitly covered that matter by requiring that the defendant be shown to have caused the death. Further, the evidence in the case so far excluded the hypothesis that the victim was solely at fault that an extended instruction on the matter would have been not only superfluous but confusing. And it would have been wrong to instruct that the defendant was not guilty if the victim's supposed negligence was a greater cause of death than the defendant's acts. "In criminal cases, as opposed to civil negligence suits, a victim's contributory negligence, even if it constitutes a substantial part of proximate cause (but not the sole cause), does not excuse a defendant whose conduct also causes the death of another." *Id.* at 87 (supporting citations omitted). The defendant surely fails to show that, in respect to the instruction on "cause," there was a substantial risk of a miscarriage of justice.

3. *Sentencing.* The defendant argues that the sentencing provisions of G. L. c. 90, § 24 G (*a*), the vehicular homicide statute (set out in full text as Appendix A to this opinion),[10] are so vague as to be void, with the result that the sentence

---

[9] The defendant attempted to make some point — a feeble one — of the victim's ten one-hundreths percent blood alcohol level (see n.1), as bearing on his possible (contributory) negligence. This figure is the lowest at which the statute creates a rebuttable presumption of intoxication, but it is solely for purposes of proving crimes involving driving under the influence. See c. 90, § 24 (1) (*e*); *Commonwealth* v. *Griffin,* 19 Mass. App. Ct. 174, 186 (1985).

[10] Section 24G (*a*) was enacted by St. 1982, c. 373, § 9, with a minor modification by St. 1982, § 376, § 1.

imposed herein for that crime must fall.[11] On the surface the provisions do raise a question of interpretation, namely, whether persons sentenced under § 24G (*a*) have any eligibility for parole or other ameliorations of sentence (notably good conduct deductions). The relevant text, however, is not "unresolvably ambiguous."[12] The Commonwealth argues that it renders these prisoners wholly ineligible. In our opinion it renders them eligible, but only after they have served one year's (mandatory) imprisonment. (It may be noted that the trial judge imposed sentence on the assumption that the defendant could become parole-eligible.)[13]

(a) We examine the critical language and consider the effect of the longstanding indeterminate sentence statute.

Section 24G (*a*) of G. L. c. 90, in pertinent part, states:

". . . shall be punished by imprisonment in the state prison for not less than two and one-half years or more than ten years and a fine of not more than five thousand dollars, or by imprisonment in a jail or house of correction for not less than one year nor more than two and one-half years and a fine of not more than five thousand dollars. The sentence imposed upon such person shall not be reduced to less than one year, nor suspended, nor shall any person convicted under this subsection be eligible for probation, parole, or furlough or receive any deduction from his sentence; provided, however, that the commissioner of correction may, on the recommendation of the warden, superintendent, or other person in charge of a

---

[11] The defendant did not make such an objection at the time of sentencing, or move on such a ground for postconviction relief under Mass.R.Crim.P. 30(a), 378 Mass. 900 (1979).

[12] Quoted from *Commonwealth* v. *Gagnon,* 387 Mass. 567, 568 (1982), where the sentencing provisions of the particular statute were internally contradictory and thus unenforceable and void. See also *Commonwealth* v. *Marrone,* 387 Mass. 702 (1982); *Commonwealth* v. *Bongarzone,* 390 Mass. 326 (1983).

[13] The judge stated that probation on the sentence for leaving the scene would begin upon "final parole" on the sentence for vehicular homicide.

correctional institution, or the administrator of a county correctional institution, grant to an offender committed under this subsection a temporary release in the custody of an officer of such institution for the following purposes only: to attend the funeral of a relative; to visit a critically ill relative; to obtain emergency medical or psychiatric services unavailable at said institution; or to engage in employment pursuant to a work release program."

The clause, "The sentence imposed upon such person shall not be reduced to less than one year," is a general statement of the result desired — roughly, imprisonment for not less than a year — and what follows forbids the use of the several particular procedures mentioned to frustrate that result. Such a reading would be perfectly clear if, following the words "or receive any deduction from his sentence," the draftsman had added, "until he shall have served one year of such sentence" (or words to that effect),[14] but the elision, we think, should not change the meaning.

This interpretation is fortified by a converging line of reasoning. The statute on indeterminate sentencing, G. L. c. 279, § 24, provides that a sentence to State prison (except for life or as an habitual criminal) shall fix a maximum term (not larger than the maximum prescribed by the particular statute punishing the offense) and a minimum (not less than two and one-half years).[15] Our § 24G (*a*) exactly tracks G. L. c. 279, § 24, and the sentence imposed in the present case was a maximum State prison term of ten years (the longest term allowed) and a minimum of nine years.

---

[14] As indicated in the discussion in (b), below, such a clause appears in sections of G. L. c. 90 enacted as parts of the statute, St. 1982, c. 373, that also enacted § 24G (*a*).

[15] Section 24 reads: "If a convict is sentenced to the state prison, except for life or as an habitual criminal, the court shall not fix the term of imprisonment, but shall fix a maximum and a minimum term for which he may be imprisoned. The maximum term shall not be longer than the longest term fixed by law for the punishment of the crime of which he has been convicted, and the minimum term shall not be less than two and one-half years."

Now it is well understood that the purpose of setting a minimum term as required by G. L. c. 279, § 24, is to establish the base for determining when a prisoner becomes eligible for parole. See G. L. c. 127, § 133; *Commonwealth* v. *Hogan,* 17 Mass. App. Ct. 186, 187-190 (1983).[16] We note that other matters are geared to eligibility for parole. By administrative regulation, 103 Code Mass. Regs. 463.07 (2) (b) (4) (1978), furlough has such a relation: in usual cases a prisoner becomes eligible for furlough after serving "twenty percent of the time between the effective date of the sentence and [his] parole eligibility date, but not more than three years." (We pass over complications.) Again, by 103 Code Mass. Regs. 464.11 (1) (a) (1978), work release — mentioned in the proviso of the sentencing part of the vehicular homicide statute — has a similar relation: a prisoner becomes eligible when "[h]e has served so much of his sentence as to be eligible for parole within eighteen months and he has been committed to the care and custody of the department for at least thirty days." (We pass over other conditions.)

As the indeterminate sentence statute applies to sentences under the vehicular homicide statute, we believe eligibility for parole is necessarily implicated, subject, however, to the one-year mandatory imprisonment; and other eligibilities are to be similarly treated.[17]

The Commonwealth has argued that the language of § 24G (*a*) which follows the clause allowing reduction of sentence to no more than a year is distinct from, and unrelated to, that clause; that there is no parole (or other) eligibility; and so, in the present case, the defendant must serve the full maximum term of ten years. Such a result, even if not beyond the power of the Legislature to command, would be extraordinary — against the grain of regular practice and expectation. It is therefore on its face a suspect result.

---

[16] In *Hogan,* the question was whether a difference of one year between maximum and minimum was a sufficient difference to satisfy § 24. The answer given was yes. That question has not been raised herein.

[17] The narrow provision of the second sentence of § 24G (*a*) allows some humanitarian relief during the mandatory period.

The Commonwealth does not go so far as to claim that the sentencing provisions of § 24G (*a*) impliedly repeal pro tanto the indeterminate sentence statute. (In rejecting an argument of implied repeal of G. L. c. 279, § 24, in another context, the Supreme Judicial Court recently characterized that statute as "basic sentencing structure." *Commonwealth* v. *Marrone,* 387 Mass. 702, 706 [1982]. *Commonwealth* v. *Graham,* 388 Mass. 115, 125 [1983].) But the Commonwealth says that, although the judge is required by the indeterminate sentence imperative to impose minimum as well as maximum terms for vehicular homicide, the minimum has "no effect" since parole is supposedly prohibited by the very vehicular homicide statute. On this interpretation the indeterminate sentence to State prison nominally imposed would turn out to be a determinate or fixed sentence in fact. Understandably uncomfortable with this analysis, the Commonwealth suggests that a judge can circumvent the indeterminate sentence statute by sentencing under G. L. c. 279, §§ 31-33, to a fixed period at M.C.I., Concord, which is not the State prison. Such a ruse — for the sole purpose in this case of securing the total elimination of eligibility for parole and other ameliorations from a ten year sentence — does not commend itself. (i) A question may be raised whether G. L. c. 279, §§ 31-33, authorizes alternative sentencing to Concord in a case like the present, where the statute defining the crime and punishment is meticulous and complete in directing persons sentenced to the 2½ to 10 years range to serve at State prison and those sentenced to the 1 to 2½ years range to serve elsewhere.[18] We do not press the point. (ii) Mere arrival of the inmate at Concord would not avoid the question of the basic intent of G. L. c. 90, § 24G (*a*), to provide parole and other eligibility after one year, as above discussed. (iii) One would expect that the inmate at Concord would be entitled, like other inmates there, to the liberal administrative regulations

---

[18] The Commonwealth cites *Commonwealth* v. *Hayes,* 372 Mass. 505, 511 (1977), *Commonwealth* v. *Gagnon,* 387 Mass. 567, 573 (1982), *Commonwealth* v. *Lightfoot,* 391 Mass. 718, 721 (1984), and *Commonwealth* v. *Dupree,* 16 Mass. App. Ct. 600, 605 (1983); but these decisions are not pointed to a statute like G. L. c. 90, § 24G (*a*).

regarding parole applicable generally at that institution; passing strange would be a contrary regime at Concord, which has long been identified with a rehabilitative program. See *Commonwealth* v. *Hayes,* 372 Mass. 505, 510 (1977). (iv) A glaring and untenable anomaly would be created if those held in State prison were considered eligible for parole but those going to Concord would not be. The anomaly is deepened when one considers the differences that would attach to many incidents of incarceration besides the prospect of early release.

(b) We widen the picture to take in surrounding material bearing further on legislative intent. Tracing history in search of such intent is made difficult in the Commonwealth because the archive that is left is so often fragmentary. However, we are able to say that the Senate bill containing the provisions that led eventually to G. L. c. 90, § 24G (*a*) — Senate No. 1999, of June, 1982, § 1[19] — had the language quoted from § 24G (*a*) in our text above, plus an "until" clause. This unmistakably meant a mandatory one-year term of imprisonment, with parole, etc. available thereafter. The House bill, No. 6621 of August, 1982, § 9, omitted the "until" clause and this version found its way into the final enactment of § 24G (*a*) by St. 1982, c. 373, § 9. There is no indication that the elision occurred deliberately with a purpose to mark a difference from the Senate draft. On the contrary, St. 1982, c. 373, at a number of places dealing with other motor vehicle offenses used the Senate formula[20] and we think this represented the substance of the legislative design for vehicular homicide as well.

[19] Under the bill, the relevant language would appear in G. L. c. 90, § 24 (1) (*h*). See also § 4 of the bill which affected G. L. c. 90, § 24G.

[20] See G. L. c. 90, § 23, second par. (operating after license revocation); § 24 (1) (*a*) (1), second, third, and fourth pars. (repetitive operating under the influence).

A like formula is not uncommon among criminal statutes outside the motor vehicle field. For example, in the firearm statute, G. L. c. 269, § 10 (*a*), considered in *Commonwealth* v. *Jackson,* 369 Mass. 904 (1976), we find: "The sentence imposed upon such person shall not be reduced to less than one year, nor suspended, nor shall any person convicted under this subsection (*a*) be eligible for probation, parole, or furlough or receive any deduction from his sentence for good conduct until he shall have served one year of such sentence."

Striking support for this conclusion comes from a report of September 15, 1983, of the Senate Committee on Post Audit and Oversight, entitled, The Impact of the Massachusetts Drunk Driving Law: One Year Later. This devoted a section to "Motor Vehicle Homicide While Under the Influence of Intoxicants" (reproduced as Appendix B to this opinion). The report stated that a question had arisen as to the meaning of the sentencing provisions. In the opinion of the committee the text as enacted revealed the legislative intent to provide eligibility for parole and other release after the mandatory one year's imprisonment. The report added that a review of committee files and consultation with other parties involved in the drafting of c. 373 supported the committee's interpretation. "[G]ood oversight practice," however, suggested that a "clearer expression of what the legislature wanted" could be attained by an amendment adding an "until" clause.

(c) Parole board practice is of some interest, as shown in material which the defendant chose to include in his record appendix. Originally the parole board accepted that the statutory intent was to provide for a mandatory minimum sentence of one year, with ordinary eligibility rules for parole applying thereafter, and the parole board proceeded on this interpretation. A later memorandum within the Department of Correction conceded that this was the intent, but supported a contrary interpretation because of the absence of explicit language; and the parole board appears to have gone along.

Following oral argument of the present appeal, we were informed that in an action brought by an inmate against the chairman of the parole board and the sheriff of Middlesex County (DiSarcina vs. Curran, Superior Court, Middlesex County, Civil Action No. 86-2093 [1986]), a judge of the Superior Court held in April, 1986, that § 24G (a) established early release restrictions only during the first year of confinement. The parole board stated in May, 1986, that it planned no appeal of the decision, and current board policy allows parole release of inmates sentenced under § 24G (a) after service of a mandatory one-year term.

(d) To sum up, we reject the defendant's contention that the sentencing provisions of § 24G (*a*) are so vague as to invalidate the statute. There is a surface unclarity that can be reasonably resolved. The resulting interpretation favors the defendant with respect to early release. Were that interpretation in doubt, the defendant would be aided by those "ordinary rules of statutory construction [that] require us to construe any criminal statute strictly against the Commonwealth." *Aldoupolis* v. *Commonwealth,* 386 Mass. 260, 267 (1982), quoting from *Commonwealth* v. *Devlin,* 366 Mass. 132, 137-138 (1974). And aided, too, by the rule that obliges us to indulge every rational presumption in favor of the validity of the statute. See *Commonwealth* v. *Gagnon,* 387 Mass. 567, 569 (1982).

*Judgments affirmed.*

APPENDIX A.

Massachusetts General Laws c. 90

"§ 24G (*a*). Whoever, upon any way or in any place to which the public has a right of access, or upon any way or in any place to which members of the public have access as invitees or licensees, operates a motor vehicle while under the influence of intoxicating liquor, or of marihuana, narcotic drugs, depressants, or stimulant substances, all as defined in section one of chapter ninety-four C, or the vapors of glue, and so operates a motor vehicle recklessly or negligently so that the lives or safety of the public might be endangered, and by any such operation so described causes the death of another person, shall be guilty of homicide by a motor vehicle while under the influence of an intoxicating substance, and shall be punished by imprisonment in the state prison for not less than two and one-half years or more than ten years and a fine of not more than five thousand dollars, or by imprisonment in a jail or house of correction for not less than one year nor more than two and one-half years and a fine of not more than five thousand dollars. The sentence imposed upon such person shall not be reduced to less than one year, nor suspended, nor shall any person convicted under this subsection be eligible for probation, parole, or furlough or receive any deduction from his sentence; provided, however, that the commissioner of correction may, on the recommendation of the warden, superintendent, or other person in charge of a correctional institution, or the administrator of a county correctional institution, grant to an offender committed under this subsection a temporary release in the custody of an officer of such institution for the

following purposes only: to attend the funeral of a relative; to visit a critically ill relative; to obtain emergency medical or psychiatric services unavailable at said institution; or to engage in employment pursuant to a work release program. Prosecutions commenced under this section shall neither be continued without a finding nor placed on file.

"The provisions of section eighty-seven of chapter two hundred and seventy-six, shall not apply to any person charged with a violation of this subsection."

APPENDIX B.

The following is an excerpt from a report of September 15, 1983, of the Senate Committee on Post Audit and Oversight, entitled, The Impact of the Massachusetts Drunk Driving Law: One Year Later.

VI. MOTOR VEHICLE HOMICIDE
WHILE UNDER THE INFLUENCE OF INTOXICANTS

"When the legislature enacted C. 373 it also changed the penalty for causing a death while operating a motor vehicle while under the influence of liquor. One of the changes was achieved with the following clause (S. 24G (*a*), C. 90):

'the sentence imposed upon such a person shall not be reduced to less than one year, nor suspended, nor shall any person convicted under this subsection be eligible for probation, parole, or furlough or receive any deduction from his sentence;'

"It is clear that by this language the legislature intended to require an offender convicted of causing a homicide while operating a motor vehicle under the influence to receive and serve a sentence of *at least one year* duration. However, in one instance where a judge sentenced a person so convicted to a ten-year sentence, a question arose as to whether that person must serve the entire ten years without possibility of parole, furlough, 'or early release. Until that time, the provision had been interpreted by the courts to mean only that the offender serve at least one year before the person would be eligible for any type of release. In cases where a longer sentence was given, the normal parole eligibility would determine when the person would be released after the one-year period has been served.

"A review of Committee files and consultation with other parties involved in the drafting of C. 373 leads the Committee to concur with the above interpretation. Although the Committee holds that the legislative intent to restrict any release until at least one year has been

served could be deduced from the clause as written, it does believe that good oversight practice would include a clearer expression of what the legislature wanted. This goal could be achieved by an amendment which would have the controlling clause read as follows:

'nor shall any person convicted under this subsection be eligible for probation, parole, or furlough or receive any deduction from his sentence, *until he has served at least one year of such sentence;*' "