## Commonwealth *vs*. Miguel A. Perez.

Hampden. November 6, 2001. - June 21, 2002.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Accessory and Principal. Assault and Battery by Means of a Dangerous Weapon. Constitutional Law,* Double jeopardy. *Practice, Criminal,* Double jeopardy. *Common Law.*

A criminal defendant who assisted perpetrators of a drive-by shooting in which two victims were wounded, and knew of these multiple felonies, was properly convicted, under G. L. c. 274, § 4, of multiple counts of being an accessory after the fact to assault and battery by means of a dangerous weapon. [189-194]

There was no merit to a criminal defendant's contention that there was no evidence that he had knowledge of a second victim arising from a drive-by shooting and that, absent such knowledge, he could not be convicted of a second charge of being an accessory after the fact to the crime of assault and battery by means of a dangerous weapon, where the defendant knew the substantial facts of what the principals had done, and certainly knew that, in firing multiple shots into a crowd of people, their conduct amounted to multiple felonies. [194-196]

Indictments found and returned in the Superior Court Department on August 11, 1998.

The cases were tried before *Constance M. Sweeney*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Susan E. Taylor* for the defendant.

*Thomas H. Townsend*, Assistant District Attorney, for the Commonwealth.

Sosman, J. The present appeal requires us to determine the appropriate unit of prosecution for the crime of being an accessory after the fact. G. L. c. 274, § 4. The defendant was convicted on two indictments charging him with being an accessory after the fact to assault and battery by means of a dangerous weapon, based on his assistance to two perpetrators of a drive-by shooting in which two victims were wounded. On

appeal, the defendant contends that the convictions, based on a single course of conduct assisting the perpetrators, are duplicative and therefore violate the prohibition against double jeopardy. Based on the common-law treatment of the crime of being an accessory after the fact, the Commonwealth contends, and the judge agreed, that the appropriate unit of prosecution for an accessory is based on the underlying felony offenses committed by the principal perpetrator. Here, where the shots fired struck two victims, and the perpetrators were thus liable for two counts of assault and battery by means of a dangerous weapon, the accessory would also be liable for two counts of being an accessory after the fact. We agree that the accessory statute, G. L. c. 274, § 4, preserves that common-law approach and that the appropriate unit of prosecution for an accessory is identical to that of the principal.

In the alternative, the defendant argues that the evidence was insufficient to show that he knew there were two victims of the shooting, thus failing to establish the knowledge element on the second indictment. See *Commonwealth* v. *Devlin*, 366 Mass. 132, 136 (1974). We reject that argument as well, and therefore affirm both convictions.

1. *Facts.* Viewing the evidence in the light most favorable to the Commonwealth, the jury could have found as follows. On the afternoon of May 3, 1998, members of the Latin Kings gang were congregated at a street corner in Holyoke. Frankie Santiago, a member of the rival La Familia gang, was driving by with his girl friend and daughter and stopped at a traffic light at that same corner. The crowd of Latin Kings recognized Santiago and began taunting him concerning the recent death of his cousin, another La Familia member. Santiago believed that the Latin Kings were responsible for his cousin's murder. The light changed, and Santiago drove on.

After dropping off his girl friend and the baby, Santiago proceeded to Springfield in search of other La Familia members. He picked up Carlos Marrero at a La Familia gathering place and told Marrero to bring his gun. The two drove back to Holyoke, past the street corner where the Latin Kings were still assembled. Marrero, standing erect through the sun roof as they drove by, fired multiple shots into the crowd. A young woman

sitting on the sidewalk was shot in the head, and a man was shot in the leg as he tried to run for cover. As they sped from the scene, Marrero told Santiago that he had "seen somebody wearing yellow go down."[1]

Santiago and Marrero drove back to Springfield, dropped off Marrero's revolver, and then proceeded to the defendant's house. The defendant, one of the founders of La Familia, lived with Santiago's aunt. Santiago parked the car in a vacant lot next to the defendant's house and went in to see the defendant.[2] Santiago's aunt was there, along with the defendant and other family members. They had already heard about the shooting and questioned Santiago about it. One of them told Santiago that someone had been shot. Santiago then spoke with the defendant, describing the incident and confirming that someone had been shot.

Meanwhile, based on information from eyewitnesses in the crowd at the scene of the shooting, the State police were looking for Santiago. They obtained Santiago's pager number and paged him. The defendant returned the call, with Santiago standing right next to him so that he could hear the conversation. The trooper who answered pretended that he was a friend of Santiago. The defendant, who initially fell for the ruse, told the "friend" that he and Santiago needed a ride. However, Santiago soon recognized that the caller was impersonating his friend and told the defendant to hang up. The trooper asked the defendant where they were. The defendant replied by giving the trooper a false address (which ultimately led the trooper to a vacant apartment).

After that conversation, the defendant gave Santiago the telephone number of John Montalvo, another La Familia founder, who lived in Brooklyn. Santiago telephoned Montalvo and asked him to come to Springfield to pick him up. Montalvo was reluctant to do so. The defendant then took the telephone, told Montalvo that "the shit hit the fan," and persuaded him to come get Santiago. Montalvo arrived at around 3 A.M. and took Santiago to Brooklyn. When Santiago departed, he left behind

---

[1]The gang "colors" for the Latin Kings are black and yellow.

[2]Marrero departed on his own, apparently without entering the defendant's house.

the keys to the car used in the shooting, which was still parked in the lot next door to the defendant's house.

By the following afternoon, the police had located the defendant by tracing his telephone call. When contacted, the defendant agreed to be interviewed. In his statement, the defendant claimed that he had not seen Santiago for two months and that the only person who had come to the house the day before was his girl friend's former father-in-law. He also claimed that he was no longer involved in La Familia, having left the gang back in 1983. Finally, he claimed that he "don't know none about the shootings" because he was at home at the time, but acknowledged that he had heard on the news the night before "that a man got shot in Springfield and a girl got shot in Holyoke yesterday."

The next day, the Springfield police located Santiago's car, abandoned and missing its registration plate, about one-half mile away from the defendant's home. Inside the car, they found a bottle of power steering fluid. Subsequent testing confirmed that the defendant's fingerprint was on that bottle. (The car chronically leaked power steering fluid and needed at least two bottles a day.) From this evidence, the jury could infer that the defendant had moved Santiago's car and had taken off the registration plate.

2. *Discussion.*

a. *Double jeopardy.* The defendant was charged in two indictments with being an accessory after the fact to assault and battery by means of a dangerous weapon. Each indictment alleged that he assisted both Santiago and Marrero with the intent that they should avoid or escape detention, arrest, trial, or punishment, with each indictment specifying a separate shooting victim. Immediately prior to trial, the defendant moved to dismiss one of the indictments on the ground that "[t]he assistance that [the defendant] is alleged to have rendered to Marrero and Santiago after the shooting took place was identical in time, place, manner and means for both of the indictments" and that he was therefore being charged twice for the same offense. The judge deferred ruling on the motion until after trial, at which time the motion was denied and the defendant was

sentenced to concurrent terms of incarceration on each indictment.

The statute provides: "Whoever, after the commission of a felony, harbors, conceals, maintains or assists the principal felon or accessory before the fact, or gives such offender any other aid, knowing that he has committed a felony or has been accessory thereto before the fact, with intent that he shall avoid or escape detention, arrest, trial or punishment, shall be an accessory after the fact . . . ." G. L. c. 274, § 4. We have long recognized that the statute's definition of accessory after the fact "is in the common law form" and "obviously has roots in the common law tradition." *Commonwealth* v. *Devlin*, 366 Mass. 132, 137 (1974).

At common law, the liability of an accessory after the fact was derived from the liability of the principal, the accessory being considered "an accomplice in the original crime." *Id.* at 136, quoting Model Penal Code § 208.32 comments, at 195 (Tent. Draft No. 9, 1959). See *Heard* v. *United States*, 686 A.2d 1026, 1029-1030 (D.C. 1996); *McKnight* v. *State*, 658 N.E.2d 559, 560-561 (Ind. 1995). Consistent with the common-law view that the accessory's liability is linked to that of the principal, we have interpreted G. L. c. 274, § 4, as requiring that the accessory know the identity of the principal perpetrator and have knowledge of the "substantial facts of the felonious crime" that the principal committed. *Commonwealth* v. *Devlin*, *supra*.

The defendant does not contest that, at common law, an accessory could be charged separately for each of the crimes perpetrated by the principal. Rather, he contends that certain features of G. L. c. 274, § 4, deviate from the common law such that we should now jettison the common-law approach to the appropriate unit of prosecution. Specifically, he points to the fact that the statute sets its own sentencing range for the crime of being an accessory after the fact, whereas at common law an accessory faced the same punishment as the principal. See *Heard* v. *United States*, *supra* at 1030; *McKnight* v. *State*, *supra* at 561; 2 W.R. LaFave & A.W. Scott, Jr., Substantive Criminal Law § 6.9, at 170 (1986); Model Penal Code and Commentaries § 242.3 comment 6, at 238 (1980). That our statute has

reduced the maximum sentence for the crime of being an acces-
sory does not change the fact that the statute defines the crime
in common-law terms, nor should it change our determination
of the appropriate unit of prosecution. See *Heard* v. *United
States, supra* (reduction in level of punishment for accessory
did not "dispense with the common law notion of derivative
culpability for accessories that would allow for multiple convic-
tions for an accessory on a par with multiple convictions for the
principal," as "the common law link between the accessory and
the principal remains intact").[3]

The defendant also points out that G. L. c. 274, § 4, goes
beyond the common law in identifying the relationships between
the accessory and the principal that will constitute a defense to
the charge of being an accessory. At common law, a wife could
not be prosecuted as an accessory after the fact for giving aid to
her felon husband. 2 W.R. LaFave & A.W. Scott, Jr., *supra* at
169, citing 4 W. Blackstone, Commentaries *38-39. No other
relative could claim such a defense at common law. 2 W.R.
LaFave & A.W. Scott, Jr., *supra.* Our statute now allows other
relatives (husbands, wives, parents, grandparents, children,
grandchildren, and siblings) to defend against an accessory
charge on the ground of their family relation to the principal
offender. G. L. c. 274, § 4. This expansion of the relationship
defense merely reflects the fact that it is unrealistic to expect
family members to deny aid to other family members, notwith-
standing their felonious conduct. See *Commonwealth* v. *Barnes,*
369 Mass. 462, 466-467 (1976), quoting R. Perkins, Criminal
Law 683 (2d ed. 1969) ("it is asking too much of a jury to
expect a conviction of one who has merely opened his door or

[3]The defendant attempts to distinguish *Heard* v. *United States,* 686 A.2d
1026, 1029-1030 (D.C. 1996), on the ground that the statute at issue in that
case set the maximum penalty for an accessory at one-half of the maximum
penalty for the principal, whereas G. L. c. 274, § 4, sets the maximum penalty
for an accessory at seven years' incarceration, without any reference to the
penalty for the underlying felony. While a provision linking the accessory's
sentence to the maximum sentence for the principal supports the conclusion
that such a statute reflects the common-law approach to accessory crimes, it is
not necessary to that conclusion. The fact remains that G. L. c. 274, § 4,
defines the crime of being an accessory after the fact "in the common law
form," *Commonwealth* v. *Devlin,* 366 Mass. 132, 137 (1974), even though the
accessory's sentence is no longer directly linked to that of the principal.

given some similar aid to a parent, child or other intimate relation"). Modernization of the relationship defense does not suggest that the Legislature intended to abandon the fundamental common-law definition of the crime itself.

The defendant argues that we have already broken the common-law link between the liability of the perpetrator and the liability of the accessory in *Commonwealth* v. *Berryman*, 359 Mass. 127, 130 (1971), where we stated that "being an accessory after the fact is distinct from being a principal." The defendant lifts the quotation out of context. In that case, the defendant had pleaded guilty to four indictments charging him as an accessory after the fact to armed robbery, and had then been convicted as a principal in a subsequent trial on the underlying robbery. At the time of his change of plea, the defendant had expressly waived any claim that the plea "in any way affects" the remaining charges. *Id.* While we recognized that "one cannot be both a principal in a crime and an accessory after the fact to the same crime," and that jury verdicts convicting a defendant as both principal and accessory therefore could not stand, *id.* at 129, the court held that the defendant was bound by his express waiver. When the defendant tried to reframe his argument in terms of double jeopardy, the court noted that the prohibition against double jeopardy applied only to "the same offence," and, because the crime of "being an accessory after the fact is distinct from being a principal," there was no double jeopardy in the convictions as both principal and accessory. *Id.* at 130. Nothing in that discussion about the "distinct" nature of the two crimes, a discussion addressing a problem unrelated to the appropriate unit of prosecution for a defendant charged solely as an accessory, undercuts the common-law roots of the crime.[4]

We recognize that commentators now recommend, and many

---

[4]Indeed, in *Commonwealth* v. *Berryman*, 359 Mass. 127, 128 (1971), the four separate charges of being an accessory after the fact stemmed from a single bank robbery during which four bank employees had been placed in fear. The defendant's argument that he had been improperly indicted "in seventeen different counts for essentially the same offence" was rejected, noting that "[e]ach indictment alleged a separate and distinct offence . . . ." *Id.* at 131. Implicitly, *Berryman* rejects the precise argument the defendant makes in the present case.

States have taken, an approach to this crime that focuses on the defendant's conduct in obstructing justice or impeding law enforcement, rather than treating the defendant as an accomplice of the principal with a form of derivative liability for the principal's crimes. See 2 W.R. LaFave & A.W. Scott, Jr., *supra* at 170 (accessory after the fact "had no part in causing the crime; his offense is instead that of interfering with the processes of justice and is best dealt with in those terms"); Model Penal Code and Commentaries, *supra* at § 242.3 comment 1, at 225, & comment 3, at 229-230. The offense as defined in the Model Penal Code "covers the common law category of accessory after the fact but breaks decisively with the traditional concept that the accessory's liability derives from that of his principal. Thus, under the Model Code provision [§ 242.3], one who harbors a murderer is not made a party to the original homicide but is convicted, as he should be, for an independent offense of obstruction of justice." Model Penal Code, Explanatory Note for §§ 242.1-242.8, 10A U.L.A. 639 (Master ed. 2001). That approach dispenses with many of the common-law elements (knowledge of the identity of the perpetrator, knowledge of the underlying felony, and even the requirement that a felony actually have been committed) and focuses instead on whether the defendant purposely hindered law enforcement. 2 W.R. LaFave & A.W. Scott, Jr., *supra* at 171-172. Model Penal Code and Commentaries, *supra* at § 242.3 comment 3, at 229-230. Under that approach, this defendant could only be charged in one indictment, as his obstruction of justice was perpetrated by means of a single course of conduct.

Our statute, however, remains in the common-law form. In *Commonwealth* v. *Devlin*, *supra* at 138-139, citing Model Penal Code §§ 242.1, 242.3 (Proposed Official Draft 1962), and Proposed Criminal Code of Massachusetts, c. 268, §§ 9, 11 (1972), we recognized the alternative "obstruction of justice" approach to such crimes. Yet, constrained by our statute's common-law form, this court imposed the traditional common-law requirements that an accessory must know both the identity of the felon he is assisting and the "substantial facts" concerning the crime the felon committed. *Id.* at 136. Despite the suggestion of an alternative approach in *Commonwealth* v. *Devlin*,

*supra* at 138-139, the Legislature has not amended the statute to transform the crime of being an accessory after the fact into the more modern articulation of the crime as an obstruction of justice. Our statute remains consistent with the common-law approach to the crime of being an accessory after the fact, and, unless and until the statute is amended, we must continue to construe it consistent with its common-law roots.

As such, the defendant's liability as an accessory is linked to the actual crimes that the assisted felon perpetrated. Here, where the principal perpetrators committed two batteries by means of a dangerous weapon, the accessory after the fact is liable for two counts of being an accessory. As in other contexts, a single criminal act can result in multiple convictions if there are multiple victims. See *Commonwealth* v. *Melton*, 436 Mass. 291, 294-300 (2002); *Commonwealth* v. *Gordon*, 41 Mass. App. Ct. 459, 465 (1996); *Commonwealth* v. *Dello Iacono*, 20 Mass. App. Ct. 83, 89-90 (1985). "Whenever a single criminal transaction gives rise to crimes of violence which are committed against several victims, then multiple indictments (and punishments) are appropriate." *Commonwealth* v. *Donovan*, 395 Mass. 20, 31 (1985), citing *Commonwealth* v. *Levia*, 385 Mass. 345, 351 (1982). The fact that the defendant's acts of assistance were identical as to time, manner, and means with respect to each underlying felony committed by the principals does not preclude multiple convictions as an accessory. The accessory's guilt under the common law is linked to that of the principal perpetrator he assists, not to the number of acts of assistance he renders or to the extent of the assistance he provides. When he assists a felon who has committed multiple felonies, and knows of those multiple felonies, he may be convicted of multiple counts of being an accessory after the fact.

b. *Sufficiency of the evidence.* In the alternative, the defendant argues that there was no evidence that he had knowledge of a second shooting victim, and that, absent such knowledge, he may not be convicted of a second charge of being an accessory after the fact to the crime of assault and battery by means of a

dangerous weapon.[5] The argument misperceives the extent of knowledge that must be shown on the part of an accessory.

In *Commonwealth* v. *Devlin, supra* at 136, we explained that an accessory must have "knowledge of the particular felony which has occurred," meaning that "an accessory must be shown to have been aware, by his observations or by information transmitted to him, of the substantial facts of the felonious crime." We further specified that "[t]here is no suggestion here that the knowledge of the accessory must be such that he is able to put a name or label on the felony — only that he is aware of the substantial facts which make up the elements of the felony." *Id.* at 136 n.4. In that case, the court was confronted with an accessory charge brought against an inmate who had helped conceal and remove fingerprints from a knife that had been used in a stabbing of another inmate, but there was no evidence indicating that the defendant was aware of how (or even whether) that knife had been used. At most, the defendant would have been aware that the knife he was helping to conceal was contraband. Lacking knowledge of the "substantial facts" of the stabbing, the defendant's conduct in trying to hide the knife and wipe fingerprints from it did not make him an accessory after the fact to an assault with intent to murder. *Id.* at 135.

Here, the defendant knew everything that the principals knew — i.e., he knew that they had driven by a group of Latin Kings, that Marrero had intentionally fired multiple shots into the crowd at fairly close range, and that at least one person in the crowd had been shot. From the facts and circumstances surrounding the incident, the potential that there would be multiple victims

[5]The Commonwealth counters that, from the defendant's statement the day after the shooting, the jury could infer that he was aware of two victims. The defendant acknowledged having seen news reports later that same night, which mentioned two shooting victims (one a "man" and the other a "girl"), although he ascribed them to two separate shooting incidents in different locations. The Commonwealth suggests that the jury could infer that the nightly news report had in fact informed the defendant of the existence of two victims and that the defendant mischaracterized the report as part of his feigned ignorance of the entire event. See *Commonwealth* v. *Holiday*, 349 Mass. 126, 128-129 (1965) (jury could find that accessory had requisite knowledge by crediting portions of defendant's statement and disbelieving other portions). In light of our view of the law concerning an accessory's knowledge, we need not address the specifics of the Commonwealth's suggested inferences.

of the shooting was apparent. Even as to the principals, there was no requirement that they know precisely how many people they had actually struck. The intentional nature of their conduct would make them liable for a battery on however many people in the crowd were ultimately shown to have been struck by one of Marrero's bullets, even though Santiago and Marrero fled the scene in ignorance of precisely how many people had been wounded. It would be ironic to conclude that, to satisfy the knowledge element for an accessory, the accessory must have even greater knowledge than the principal. Here, the defendant knew the "substantial facts" of the entire incident, and thus knew the precise conduct of the principal perpetrators at the time that he rendered aid to them. That he, like the principals themselves, did not yet know the exact number of victims who had suffered gunshot wounds as a result of that conduct does not detract from the defendant's extensive knowledge of the shooting. The defendant here is not comparable to the defendant in *Commonwealth* v. *Devlin, supra* at 136, who had no knowledge of any felony having been committed at all. This defendant knew the "substantial facts" of what the principals had done, and certainly knew that, in firing multiple shots into a crowd of people, their conduct amounted to multiple felonies. See *Commonwealth* v. *Melton*, 436 Mass. 291 (2002) (single shot fired into passing vehicle containing four people constitutes four assaults by means of a dangerous weapon). The defendant's inability at the time "to put a name or label on [each] felony," *Commonwealth* v. *Devlin, supra* at 136 n.4, does not render the evidence of his knowledge insufficient.

*Judgments affirmed.*